## UNITED STATES v. GEDDES.

(Circuit Court of Appeals, Sixth Circuit.   June 8, 1904.)

No. 1,270.

1. SAFETY APPLIANCE ACT—NONCOMPLIANCE—INTERSTATE TRAFFIC—INTRASTATE RAILROADS.

Defendant, as receiver, operated a' narrow gauge railroad wholly in Ohio, which connected at one of its termini with the B. & O. Railroad.   Defendant refused to ship interstate traffic over his road, either received from or delivered to the B. & O. road, under a through bill of lading, or any other arrangement, except that, on the delivery of such freight shipped over defendant's road under a local bill of lading at its terminus, it should be received for transportation without the state by the B. & O. road under another bill of lading, the latter road assuming defendant's local freight charge, and defendant, on receiving such shipments from the B. & O. for transportation to points on his line, charged a local freight tariff from the receiving point to destination, also assuming payment of the B. & O.'s advance charges, settlement of freight between the parties being made weekly.   Held, that defendant's railroad was not engaged in interstate commerce within the meaning of, and was, therefore, not liable for penalties for noncompliance with, the safety appliance act (Act Cong. March 2, 1893, c. 196, 27 Stat. 532, as amended by Act Cong. April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3175]), requiring common carriers engaged in interstate commerce by railroad to equip their cars with automatic couplers, etc.

In Error to the District Court of the United States for the Southern District of Ohio.

This was a suit on behalf of the United States for the recovery of penalties provided by Act Cong. March 2, 1893, c. 196, § 6, 27 Stat. 532, as amended by Act Cong. April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3175], known as the "Safety Appliance Act."   The sections of the act involved are:

"Section 1. That from and after the 1st day of January, 1898, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine in moving interstate traffic not equipped with a power driving wheel brake and appliances for operating the train brake system, or to run any train in such traffic after said date that has not a sufficient number of cars in it so equipped with power or train brakes that the engineer on the locomotive drawing such train can control its speed without requiring brakemen to use the common hand brake for that purpose."

"Sec. 2. That on and after the 1st day of January, 1898, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic not equipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars."

"Sec. 6. That any such common carrier using any locomotive engine, running any train, or hauling or permitting to be hauled or used on its line any car in violation of any of the provisions of this act, shall be liable to a penalty of one hundred dollars for each and every such violation, to be recovered in a suit or suits to be brought by the United States District Attorney in the district court of the United States having jurisdiction in the locality where such violation shall have been committed; and it shall be the duty of such District Attorney to bring such suits upon duly verified information being lodged with him of such violation having occurred; and it shall also be the duty of the Interstate Commerce Commission to lodge with the proper district attorneys information of any such violations as may come to its knowledge," etc.

The petition contains four causes of action, alleging four violations of the law, based upon the movement of four cars used in moving interstate traffic, but not equipped with automatic couplers.   A jury was waived and the court found in favor of the defendant on the ground that the railroad operated by

him was not engaged in interstate commerce and that the cars complained of were not used in moving interstate traffic.

The Ohio River & Western Railway Company (operated by the defendant as receiver) was, at the time of the acts complained of, a common carrier owning and operating a narrow gauge railroad about 100 miles long, wholly within the state of Ohio, from Bellaire, on the Ohio river, to Zanesville, a town in the interior. At Bellaire it connected with the Baltimore & Ohio road, in the sense that it received from the Baltimore & Ohio freight from other states marked for points on its line, and delivered to the Baltimore & Ohio freight from points on its line marked for other states, in the following manner: There was no interchange or common use of cars, the gauges of the two roads being different. The cars of the defendant road were used only on its own line. But a transfer track ran from the main line of the Baltimore & Ohio to the terminal station of the defendant road, so that the freight cars of the two roads could be placed alongside adjoining platforms and the transfer of freight made by the use of trucks handled by the Baltimore & Ohio men. No through bills of lading for such freight were issued by either road, no through rate was fixed by mutual arrangement, and no conventional division of a through freight charge was made. Each road charged and collected its local freight rate in this way: Freight transported to Bellaire by the defendant road and marked for a point in another state was delivered to the agents of the Baltimore & Ohio, with an expense or transfer bill, which stated the original point of shipment, the consignee and place of consignment, and the freight charges of the delivering road. Waybills also accompanied the traffic. On taking charge of the freight, the Baltimore & Ohio would assume the payment of the freight charges of the defendant road, collecting the entire charges on delivering the freight at its destination. The same method was pursued with respect to freight coming from outside Ohio, and destined for a point on the line of the defendant road within Ohio, except that the agents of the Baltimore & Ohio at Bellaire would bring the traffic to and put it in the cars of the defendant road. On receiving the freight, with the expense or transfer bill, the defendant road would assume the charges of the Baltimore & Ohio, collecting the entire freight charges at the destination. There were weekly settlements between the two roads of these collections, and the payment of any balance found to be due on such settlements; but each road became responsible for the freight charges of the other, whether they were ever collected from the consignee or not. Such transfers of traffic were made nearly every day. Each company's freight charges were in accordance with its own rates.

The acts upon which the suit was based were the hauling in a car not equipped with automatic couplers, from Summerfield, Ohio, to Bellaire, Ohio, of 37 cases of eggs destined for Pittsburg, Pa., and delivered at Bellaire to the Baltimore & Ohio road for shipment there; and the hauling in three separate cars not equipped with automatic couplers, from Bellaire, Ohio, to Woodsfield, Ohio, of certain coils of wire rope shipped from Philadelphia, consigned to Woodsfield, and transferred from the Baltimore & Ohio to the defendant road at Bellaire for shipment to Woodsfield. It does not appear that any through bills of lading were issued for this freight. The form of bill of lading used by the defendant company was produced. It had on it the following printed notice: "This blank must in no case be filled with the name of any station or place beyond the line of this company's road."

Sherman T. McPherson and L. A. Shaver, for the United States. W. F. Hunter, for defendant in error.

Before LURTON, SEVERENS, and RICHARDS, Circuit Judges.

RICHARDS, Circuit Judge, after making the foregoing statement of the case, delivered the opinion of the court.

In the cases of The Daniel Ball, 10 Wall. 557, 565, 19 L. Ed. 999 (decided in 1870), and Coe v. Errol, 116 U. S. 517, 528, 6 Sup. Ct. 475, 479, 29 L. Ed. 715 (decided in 1885), it was held that:

"Whenever a commodity has begun to move as an article of trade from one state to another, commerce in that commodity between the states has commenced."

In the former case it is said:

"The fact that several different and independent agencies are employed in transporting the commodity, some acting entirely in one state, and some acting through two or more states, does in no respect affect the character of the transaction. To the extent in which each agent acts in that transportation, it is subject to the regulation of Congress." Page 565, 10 Wall., 19 L. Ed. 999.

And in the latter:

"But this movement [from state to state] does not begin until the articles have been shipped or started for transportation from the one state to the other. The carrying of them in carts or other vehicles, or even floating them to the depot where the journey is to commence is no part of that journey. * * * Until actually launched on its way to another state, or committed to a common carrier for transportation to such state, its destination is not fixed and certain." Page 528, 116 U. S., page 479, 6 Sup. Ct., 29 L. Ed. 715.

The Daniel Ball Case involved the authority of the United States to license a vessel engaged in transportation on its navigable waters, and Mr. Justice Field, who delivered the opinion, took pains to say (page 566, 10 Wall., 19 L. Ed. 999):

"We are not called upon to express an opinion upon the power of Congress over interstate commerce when carried on by land transportation."

In 1887, Congress passed what is known as the "Interstate Com merce Act" (Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 [U. S. Comp. St. 1901, p. 3154]), and, not content with the definition to be drawn from these cases, in the first section defined as follows, common carriers engaged in interstate or foreign commerce made subject to the act:

"The provisions of this act shall apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water, when both are used, under a common control, management, or arrangement, for a continuous carriage or shipment, from one state or territory of the United States, or the District of Columbia, to any other state or territory of the United States or the District of Columbia, or from any place in the United States to an adjacent foreign country, or from any place in the United States through a foreign country to any other place in the United States, and also to the transportation in like manner of property shipped from any place in the United States to a foreign country and carried from such place to a port of transshipment, or shipped from a foreign country to any place in the United States and carried to such place from a port of entry either in the United States or an adjacent foreign country."

In Texas & Pacific Railway v. Interstate Commerce Commission, 162 U. S. 197, 16 Sup. Ct. 666, 40 L. Ed. 940, the Supreme Court, speaking by Mr. Justice Shiras, after quoting the above provisions, said (page 212, 162 U. S., page 672, 16 Sup. Ct., 40 L. Ed. 940):

"It would be difficult to use language more unmistably signifying that Congress had in view the whole field of commerce (excepting commerce wholly within a state), as well that between the states and territories as that going to or coming from foreign countries."

If this statement be accurate, if Congress, by this definition, did mean to include within its regulating power every carrier engaged in interstate or foreign commerce, then to be a "common carrier engaged in

interstate commerce by railroad," within the meaning of the Safety Appliance Act, a railroad must be "engaged in the transportation of passengers or property wholly by railroad or partly by railroad and partly by water when both are used, under a common control, management, or arrangement for the continuous carriage or shipment" from one state to another. The court below, taking the view that the interstate commerce act and the safety appliance act are in pari materia, and referring to the above definition, reached the conclusion there was no arrangement between the two roads for a continuous carriage or shipment from one state to another, and therefore found in favor of the defendant, holding it was not engaged in interstate commerce.

It is vigorously insisted that the acts are not in pari materia, and that Congress, by the use of broader terms in the later act, intended a wider application of its provisions. In one sense, the two acts are in pari materia, in another, not. Both relate to the regulation of commerce among the states under the supervision of the Interstate Commerce Commission. The first deals largely with rates and fares—the cost of the commerce; the second with locomotives and cars—the instrumentalities used to carry it on. The first was intended, primarily, to protect shippers; the second, railroad employés; both, ultimately, to promote the best interests of the public. In each act, Congress seeks to regulate commerce. What commerce? Commerce among the several states. It was desirable, therefore, in the first act, to define that commerce. Having done this once, it was sufficient, in the second act, to apply its provisions to carriers "engaged in interstate commerce," adopting the definition of the first. This brings us to the question whether the defendant was "engaged in interstate commerce" within the meaning of the congressional definition.

In the case of Cincinnati, New Orleans & Texas Pacific Railway v. Interstate Commerce Commission, 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935 (the Social Circle Case), it was held that the Central Railroad of Georgia was engaged in an act of interstate commerce in transporting from one point to another in Georgia freight which had been shipped from Cincinnati, Ohio, to Social Circle, Ga., under a through bill of lading, with a through charge and an arrangement for a conventional division of the entire charge among the railroads contributing to the movement of the traffic. Mr. Justice Shiras, speaking for the court, said (page 193, 162 U. S., page 704, 16 Sup. Ct., 40 L. Ed. 935):

"All we wish to be understood to hold is that when goods shipped under a through bill of lading, from a point in one state to a point in another, are received in transit by a state common carrier under a conventional division of the charges, such carrier must be deemed to have subjected its road to an arrangement for a continuous carriage or shipment within the meaning of the act to regulate commerce. When we speak of a through bill of lading, we are referring to the usual method in use by connecting companies, and must not be understood to imply that a common control, management, or arrangement might not be otherwise manifested."

"It may be true," said the same Justice (page 191, 162 U. S., page 703, 16 Sup. Ct., 40 L. Ed. 935), "that the Georgia Railroad Company, as a corporation of the state of Georgia, and whose entire road is within that state, may not be legally compelled to submit itself to the provisions of the act of Congress, even when carrying between points in Georgia freight that has been brought from another state."

In the present case there was no through bill of lading, no through charge, no conventional division thereof among the carriers, and no arrangement for a continuous carriage or shipment, unless the method of transfer by which the receiving road assumed the payment of the charges of the delivering road constituted such an arrangement. If it did, then the only way a local road can escape participation in an arrangement for a continuous carriage or shipment of freight from one state to another is to refuse altogether to handle such freight; and it cannot do this, for, as a common carrier, it is bound to receive and transport from one point to another on its line, freight offered it for transportation, regardless of the origin or destination of the freight; so, notwithstanding the fact that, in the cases of Osborne v. Florida, 164 U. S. 650, 17 Sup. Ct. 214, 41 L. Ed. 586, Pullman Company v. Adams, 189 U. S. 420, 23 Sup. Ct. 494, 47 L. Ed. 877, and Pennsylvania R. R. Co. v. Knight, 192 U. S. 21, 24 Sup. Ct. 202, 48 L. Ed. 325, the Supreme Court apparently recognized the privilege of express, sleeping car, and railroad companies to limit the nature of their business, making it local or interstate or both, as they please, under this construction of the law, there could be no option or choice on the part of the local road as to whether it would or would not engage in interstate commerce, and thus subject itself to the acts of Congress regulating that business.

The defendant company did all it could to keep its business local. It limited its interest, so far as it could, to the transportation of the freight over its own line. It made no arrangement with the Baltimore & Ohio for through carriage either way. It was interested in none. It shared in none. It was interested only in its own local charge, and whatever arrangement it made was with a view simply of securing this. The fact that certain goods transported by it were marked for other states or received from other states did not make it a party to any arrangement for their interstate transportation in either direction. The part it performed was purely local. The interstate portion of the transportation was performed by the Baltimore & Ohio. When it delivered the goods to that road, they were still in Ohio. They might have stopped there for aught it cared. It had made no arrangement for their transportation any further. And so with the goods it received from the Baltimore & Ohio. They were offered to it in Ohio, and it was a matter of indifference to it where they came from. It had been no party to their transportation into Ohio. It received them virtually as Ohio goods, and carried them from one point to another in the state.

Taking the view that the defendant road, at the time of the acts complained of, was not engaged in interstate commerce, and that the cars which hauled the cases of eggs from Summerfield to Bellaire, and the coils of rope from Bellaire to Woodsfield, were not engaged in "moving interstate traffic," we affirm the judgment of the lower court.