UNITED STATES v. CHICAGO, M. & ST. P. RY. CO.

(District Court, S. D. Iowa, C. D.   November 27, 1906.)

1. COMMERCE—INTERSTATE COMMERCE.

All commerce in the United States is under control of either a state or of the nation, and it cannot be justly claimed that any of such commerce· falls within the power of neither; and when merchandise is carried from one state into another, no system or scheme can be devised to make it intrastate traffic.

2. RAILROADS—STATUTORY REGULATION—EQUIPMENT OF TRAINS—SAFETY APPLIANCES.

The undoubted purpose of Congress in enacting the safety appliance laws was humanitarian, and such statute should not be frittered away by judicial construction.

3. SAME.

Two of the purposes for which the safety appliance act of 1893 (Act March 2, 1893, c. 196, § 1, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]) was amended by the act of 1903 (Act March 2, 1903, c. 976, § 1, 32 Stat. 943 [U. S. Comp. St. Supp. 1905, p. 603]) were: (1) To include certain vehicles omitted by the former statute; and (2) to include cars "used" by an interstate carrier on any part of its line.    The original statute was broadened, and not restricted, by substitution of the word "use" for the words "haul and use."

4. SAME.

Where an interstate carrier hauls cars considerably damaged by derailment, so that the coupling devices are gone, 379 miles past three or more places where repairing is done, in order to make the repairs at larger and better equipped shops, it violates the safety appliance law.

5. SAME—DEFECTIVE COUPLING.

Where a coupler couples by impact, but cannot be uncoupled, unless the brakeman or switchman goes between, or over, or under the cars,

or around the end of the train, in order to reach the appliance on the connecting car, such a coupling is defective, and prohibited by law.

6. COMMERCE—INTERSTATE COMMERCE.

A carrier operating its own construction train, which hauls its own rails and products from a point in one state to a point in another state, is engaged in interstate commerce.

7. RAILROADS—STATUTORY REGULATION—EQUIPMENT OF TRAINS—SAFETY APPLIANCES.

If an interstate carrier receives and hauls a defectively equipped foreign car, which it cannot be required to do, it violates the federal safety appliance acts.

(Syllabus by the Court.)

Lewis Miles, U. S. Atty., and Luther M. Walter, special counsel, for the United States.

J. C. Cook and George H. Carr, for defendant.

SMITH McPHERSON, District Judge (charging jury): This case has been fully heard by the court and jury on oral testimony, at the close of which each party moved for a peremptory direction for a verdict under every one of the four counts of the petition. It is my custom, and, as I think, my duty, when taking a case from the jury, to explain why that body can have nothing further to do in the case, I assuming all responsibility. This is an action by petition, under direction of the Attorney General, on information of the interstate commerce commission, against the defendant company for four alleged violations of the acts of Congress of 1893 (Act March 2, 1893, c. 196, § 1, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), amended in 1896, and act of 1903 (Act March 2, 1903, c. 976, § 1, 32 Stat. 943 [U. S. Comp. St. Supp. 1905, p. 603]), relating to coupling and uncoupling devices.

The act of 1893 makes it unlawful for a company to do certain things: First. To haul a car. Second. To permit the car to be hauled. Third. To use or permit a car to be used. All three of these prohibitions are with reference to cars on the lines of the company within this judicial district. And the prohibitions are with reference to cars used only in interstate traffic, and which cars are not equipped with couplers coupling automatically by impact, and which cars can be uncoupled without the necessity of men going between the ends of the cars. It is contended with much earnestness that as this is a penal statute the statute must be strictly construed. This point need be elaborated but little. It is an elementary rule of construction, that the statute cannot be broadened by construction, so as to cover acts or omissions not clearly within the spirit and language of the statute. But while this is conceded, another rule equally important and as clearly established is that statutes are not to be frittered away by courts by construction. A statute, like a contract, must be held up by the four corners and examined, and when remedial in its nature, it must be examined in the light of its history and its purposes, and the then existing evils, which were to be corrected, remedied, and prevented. The statutes, and particularly that of 1903, are assailed as being beyond the power of Congress.

I shall devote but little time to argument as to this. I shall state my views, and then leave that phase of the case. As every one knows, it at times is difficult to state whether certain traffic is within the power of a state or that of Congress. But we all agree that, generally speaking, when the traffic starts from, is carried, and ends within the one state, Congress cannot regulate it, and that the state only can do so. And, generally speaking, we all agree that when the traffic starts from within one state and is carried to a point within another state, the state cannot regulate it, and Congress alone can do so; and particularly is this so when Congress has legislated with reference thereto. The only dissent that can be urged against the foregoing is one phase of the question not covered by the facts of this case, and not necessary to now state. In so far as commerce can be regulated or controlled, it falls within the power of a state, or of Congress. To say that it falls within the power of neither is to argue an absurdity, and to say that up in the air somewhere is a subject-matter not grappled with by either the state or nation. I do not for one moment believe in that kind of talk. It is due to counsel to say that no such argument was made in this case, but it is often made. It is enough to know and state that, in the case now for decision, questions of interstate traffic alone are presented, which will be noticed later on, connected with which were the evils to be remedied, corrected, or prevented. It is within the knowledge of most men that back of a few years ago, when the pin and link couplers were in use, it was of almost daily occurrence for a heavy freight train to break into two parts. This was unavoidable because of the weakness of the couplers and the great amount of slack. The results were injuries to and deaths of employés and passengers in the way car or caboose, as well as the damage to property, and particularly live stock. But the greater evil to be corrected was the injuries to and deaths of those required to couple and uncouple cars. Ten and more years ago every day we read of men killed in making and unmaking couplings. Seldom did we then meet a brakeman or switchman but who had been injured while at work. The court dockets, state and federal, were in part made up of such personal injury cases. The plaintiff charged negligence, generally, against the engineer, and the company denied that, and pleaded contributory negligence on the part of the injured man, and that he assumed all such risks. Some of them recovered large judgments, and others were defeated. I do not know whether statistics are obtainable as to whether the judgments obtained against and expense incurred by the companies were greater than those incurred in putting on the automatic coupler. But aside from all that, an undoubted purpose of Congress was humanitarian. The purpose was to end the maiming and killing of the vast army of men engaged in railroad work. And that the results have been good one now needs but look at the court dockets and the men newer in the railroad service and read the statistics of the past few years.

But it is contended that one or more of the cars in question was not in use in interstate traffic, and therefore not covered by the act of 1893, and that such car or cars were not in "use," and there-

fore not covered by the act of 1903. And this argument was made before me, because, under the act of 1893, the car must have been "hauled or used" in interstate traffic. Why was the statute of 1903 passed as an amendment to the prior act? Was there an evil still existing under the former statute? If so, what was it? Was there a difficulty in enforcing the older statute? If so, what? The older statute was with reference only to cars used in moving interstate traffic, regardless of whether it was a local road or one extending into several states. The reported cases, and the reports of the Interstate Commerce Commission, show that it was often difficult to prove for what traffic, local or interstate, the car was being used, and without such evidence neither state nor national prosecution could be carried on. And therein the older statute was thought to be defective. And to cure that defect, the later statute covers all cars used on any railroad engaged in interstate traffic, regardless of whether the particular car was for local or interstate use.

The Circuit Court of Appeals for this circuit had held August 28, 1902, in the case of Railway v. Johnson (117 Fed. 462, 54 C. C. A. 508), affirming the Circuit Court for the District of Utah, that the older statute did not cover a locomotive under the term "car." Knowing that other courts might adopt that construction, and knowing that all judges on the circuit within this circuit must follow such construction, Congress in the later statute required locomotives to be equipped the same as cars. And as to couplers, no other changes were made. And as to locomotives, the change was not necessary, because of the reversal of the Circuit Court of Appeals by the Supreme Court, December 19, 1904, as will be seen by the report of the same case. Johnson v. Railway, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363. But such reversal was not obtained until after the enactment of the later statute. And yet, in the face of this undisputed history, and these undisputed facts, counsel for defendant contend the later statute curtailed the provisions of the older statute. Such an argument only has force by adopting, and alone following the strict construction theory pertaining to penal statutes, which as to this statute was brushed away by the Supreme Court in the Johnson Case, because while it is penal, yet it also is remedial. And because the older statute recited the words "haul and use," and the later statute the word "use," only, therefore, the word "use," only must be referred to with reference to cars engaged in local traffic on an interstate road. I have found no word in the history of these statutes to warrant such as being the purpose of Congress. If Congress could regulate the use it could regulate the hauling. The maiming and killing of men was what Congress was striking at. And I can conceive of no reason, and none was offered in argument, why Congress intended to abridge the older statute, while it was apparent that it was enlarged for the two purposes stated. As to one count, the car was used or hauled but a short distance. But the car was employed both in interstate traffic and on an interstate road. And the distance cannot be chopped up so as to make it partly state and partly interstate. None of the cases cited otherwise holding are of binding authority on this court, and the reasoning in

the opinions are not at all persuasive to me. The merchandise was to be and was carried from one state into another, and when such is the case no system nor scheme of bills of lading, waybills, transfers, or other schemes, necessary or devised, can make it state or local traffic. No single step in the entire distance can be taken and thereby get out from under the national statute, if there is one. Such are my views of the powers of Congress, the purposes thereof, and the construction to be given the two statutes.

It remains to present my views as to the several counts of the petition.

Count 1. That is with reference to a refrigerator car of another company, with the coupling devices gone and chained to a car of defendant. It was hauled from Elmira, Mo., to Dubuque, Iowa, thus chained, a distance of 379 miles. Near Elmira it, with several other cars, was derailed, thrown down an embankment, left on its side, and off its trucks. A wrecking crew, with two locomotives, in pulling it up to the track still further injured it, but placed the trucks under it, chained it to another car, and placed them in a train for Dubuque. These two cars, so far as made to appear, were not uncoupled in transit; and how many cars were taken out and put into the train within the 379 miles is not made known, nor how many brakemen or switchmen went between them to uncouple and gave up the effort, can only be surmised. The excuse for taking it 379 miles thus chained is, that at Dubuque the company has extensive shops for making permanent repairs, while at Kansas City, a short distance west of Elmira, and at three or more places between Elmira and Dubuque, the company was only equipped for making light repairs. A great part of the time of this trial was taken up with evidence as to whether the damage to the cars was of a light nature, or such as required repairs of an extensive kind. If slight, they could have been made at nearby points. If extensive, and which could be made only at Dubuque, then the evidence without conflict shows that this empty box car, with the trucks detached as they were, could easily have been placed on a flat car properly equipped. And all the witnesses who testified on the subject, defendants included, say that such is easily and often done. And, in my opinion, defendant did not have the choice of methods, by abandoning the one quite or nearly as cheap, entirely safe, and adopt the other, which was a menace to life at every stopping place for nearly 400 miles, and, in my judgment, unlawful.

Second Count. This covers a car loaded with old steel rails taken from the tracks in Iowa and being hauled to a point in Illinois, to there be placed in side tracks or put to some other use by the company. The coupler would couple by impact, but could not be uncoupled without going between the cars, except as the attached car might have the appliance on that side of the car, where the brakeman or switchman might be, or by going over or under the cars or around the end of the train. The statute will admit of no such construction. Another defense pleaded is that, as the company was hauling its own rails, and would receive no compensation, it was not engaged in commerce or traffic. That is to say, that construction trains with cars

both hauled and used, both locally and across state lines, and cars hauled and used, as just stated, for hauling its own products, can still be equipped with links and pins and fastened with chains, and can be carried back and forth over thousands of miles of roads. Counsel will not expect me to discuss that.

Third Count. The facts under this count for all practical purposes are the same as those under the second count. It was being taken from a point in Missouri across Iowa, to a point in Illinois.

Fourth Count. The facts under this count have caused more discussion by counsel, and me more thought, than all other phases of this case. It was an Illinois Central Railroad car loaded with lumber, brought from a point in Arkansas to Ottumwa, Iowa, consigned to a manufacturing or industrial plant at the latter place. What company brought the car out of Arkansas is not made to appear. The Rock Island Company brought the car to Ottumwa, and that company placed it with a string of cars on the tracks of defendant, which in turn was to take it a few blocks to the house or plant of the consignee. By doing this with that car, defendant is not only an interstate road, but was engaged in an interstate traffic. Soon after the car was placed on defendant's sidetrack, two different efforts were made to uncouple it, when in motion, and which uncoupling was made as it only could be done by a man going between the ends of the cars. One of the appliances was broken, but when or where is not made known, and the defect could not be detected by the eye. While these efforts to uncouple were being made, inspectors of the government witnessed the same, and made report thereof, this case, as to this count, being the result. The defendant's inspectors when the car was received, and at no other time until after it was known that the government inspectors had witnessed the foregoing, made no effort to inspect this and the other cars. Thereafter, it was placed on other side tracks until repaired, which was easily done by substituting for the defective appliance one kept in stock, and at a trifling and nominal expense. On this state of facts, in my opinion, the company is liable for the penalty of $100. Defendant's counsel have said much as to acts of necessity being a defense, and have cited many cases. The complete answer thereto is that this was not a necessity. The company is not under a necessity to receive defective foreign cars. True it is that this car was placed on its track by another company, but no doubt with and under an implied if not an express contract for so doing. And if a defective foreign car is received, and no inspection is made, the receiving company is liable for injuries and damages that follow. The rule generally is, as contended by defendant's counsel, that guilty knowledge is necessary to constitute an offense. But the statutes in question make no such requirements. When passing on the demurrer to this count I referred to the numerous cases, without citing them, where one who allows a minor in a billiard room or saloon is liable, even though he believes the party is an adult. And to many like cases I alluded. But it is now contended that such cases are not in point, because there is no general right to have a billiard hall or saloon, a license therefor being necessary. Such an attempt to dis-

tinguish those cases from the one at bar is not an answer. Take the cases for violations of the pure food laws. It is no defense for the seller that he believed the food was pure. Statutory offenses generally are complete when the language of the statute is violated.

Mr. Merritt of the jury will act as foreman, and, as such will sign the four verdicts which I now hand him, which are for the government under all the counts, and on which judgments will be entered. All of which is now done.