## PACIFIC COAST RY. CO. v. UNITED STATES.†

(Circuit Court of Appeals, Ninth Circuit. October 4, 1909.)

### No. 1,658.

**1. COMMERCE (§ 27*) — FEDERAL SAFETY APPLIANCE ACT — CONSTRUCTION AND SCOPE.**

The federal safety appliance act of 1893 (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885), applies to a railroad which takes part in the transportation of articles of interstate commerce on any part of the way to their point of final destination, although operated wholly within a single state, independently of connecting lines, and without any traffic arrangement with them.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 27.*]

**2. COMMERCE (§ 27*)—FEDERAL SAFETY APPLIANCE ACT—CONSTRUCTION.**

Safety Appliance Act March 2, 1893, c. 196, 27 Stat. 531 (U. S. Comp. St. 1901, p. 3174), as amended by Act March 2, 1903, c. 976, 32 Stat. 943 (U. S. Comp. St. Supp. 1907, p. 885), which in terms applies to "any common carrier engaged in interstate commerce by railroad," is not limited by the provisions of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), which expressly apply only to carriers "under a common control, management, or arrangement for a continuous carriage or shipment"; the two acts, having entirely distinct pur-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

† Rehearing denied.

poses and providing remedies for different evils, not being in pari materia in such sense that the provisions of one should control or limit the other.

[Ed. Note.—For other cases, see Commerce, Dec. Dig. § 27.*]

In Error to the District Court of the United States for the Southern Division of the Southern District of California.

Proceeding by the United States against the Pacific Coast Railway Company for violation of the safety appliance act. Judgment for the United States, and defendant brings error. Affirmed.

The plaintiff in error is a common carrier, organized under the laws of the state of California, engaged in operating a narrow-gauge railway situate entirely within two counties of that state, Santa Barbara and San Luis Obispo counties. As such common carrier, it received at San Luis Obispo, from the Southern Pacific Company, freight consigned from points in Eastern states, and which was in some instances billed from the point of shipment to a station on the line of the road of the plaintiff in error, and in other instances was billed to San José, a terminal point of the Southern Pacific Company. In the latter case the goods were consigned to the order of the shipper, but thereafter, and before their arrival at San José, the shipper had arranged with the Southern Pacific Company that on and after their arrival the goods should be forwarded by that company to stations on the line of the road of the plaintiff in error, the places of their ultimate destination. For this the shipper would prepay to the Southern Pacific Company the additional freight to the point of destination. The road of the plaintiff in error being one of narrow gauge, no cars of the Southern Pacific Company ever passed over its line, and all goods consigned to points on its line were unloaded from the Southern Pacific cars at San Luis Obispo, and there reloaded upon the cars of the plaintiff in error. At San Luis Obispo the plaintiff in error would receive from and give its receipt to the Southern Pacific Company as the shipper of the property at that point. The plaintiff in error had no contractual relation with the original shipper, and no traffic arrangement with the Southern Pacific Company or any other carrier.

Gibson, Trask, Dunn & Crutcher and George W. Towle, for plaintiff in error.

Oscar Lawler, U. S. Atty., and A. I. McCormick, Asst. U. S. Atty.

Before GILBERT and ROSS, Circuit Judges, and HUNT, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). The principal question which the writ of error brings to our attention is whether or not the plaintiff in error has been engaged in interstate commerce by railroad, within the safety appliance act of Congress of March 2, 1893 (27 Stat. 531, c. 196 [U. S. Comp. St. 1901, p. 3174]), and the amendment thereto of March 2, 1903 (32 Stat. 943, c. 976 [U. S. Comp. St. Supp. 1907, p. 885]). It is not denied that its trains and cars were not equipped as required by that act. The question is one in answer to which the Circuit Court of Appeals for the Sixth Circuit and that for the Eighth Circuit have in similar cases reached contrary conclusions. United States v. Geddes, 65 C. C. A. 320, 131 Fed. 452; United States v. Colorado & N. W. R. Co., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167.

In the Geddes Case a receiver was operating a narrow-gauge railroad which lay wholly within the state of Ohio, connecting at Bellaire with the Baltimore & Ohio Road, in that it received from that road

---

freight from other states marked for points on its line and delivered to that road freight from points on its line marked for other states. There was no interchange or common use of cars; the gauges of the two roads being different. A transfer track ran from the main line of the Baltimore & Ohio to the terminal station of the defendant road, so that the freight cars of the two roads could be placed alongside adjoining platforms for the transfer of freight. No through bills of lading for the freight were issued by either road, and no through rate was fixed by mutual agreement, nor was there any conventional provision for a through freight charge. The Circuit Court of Appeals held that the narrow-gauge cars in question were not subject to the safety appliance act, and that a common carrier was not "engaged in interstate commerce by railroad," within the meaning of the act, unless it was "engaged in the transportation of passengers or property wholly by railroad or partly by railroad and partly by water when both are used under a common control, management or arrangement for a continuous carriage or shipment," from one state to another. In other words, the court, in construing the safety appliance act, referred back to and was controlled by the definition of interstate commerce found in section 1 of the act of February 4, 1887 (24 Stat. 379, c. 104 [U. S. Comp. St. 1901, p. 3154]), known as the "Interstate Commerce Act," and held that that act defined the interstate commerce which Congress intended to regulate in the safety appliance act, and that the acts were, in a certain sense, in pari materia.

In United States v. Colorado & N. W. R. Co., on the other hand, it was held that while the interstate commerce act was intended, as shown by its express terms, to regulate the conduct of those who conduct transportation with another or other carriers under a common control, management, or arrangement for a continuous carriage or shipment, the safety appliance act, containing no such words of limitation, but expressly applying "to any common carrier engaged in interstate commerce," was intended to be more broad and inclusive, and to extend to all classes of interstate commerce by railroads, and hence to include those who conducted such transportation alone or with other carriers, without any common control, management, or arrangement for such carriage or shipment. Upon the contention that the two acts were in pari materia the court said:

"The subject of the first act was the contracts, the rates of transportation of articles of interstate commerce; the subject of the safety appliance acts was the construction of the vehicles, the cars, and engines which carry that commerce. The evils the former was passed to remedy were discrimination and favoritism in contracts and rates of carriage; the evils the latter was enacted to diminish were injuries to the employés of carriers by the use of dangerous cars and engines. The remedy for the mischiefs which induced the passage of the former act was equality of contracts and rates of transportation; the remedy for the evils at which the latter act was leveled was the equipment of cars and engines with automatic couplers. Neither in their subjects, in the mischiefs they were enacted to remove, in the remedies required, nor in the remedies provided, do these acts relate to similar matters, and the rule that the words or terms of acts in pari materia should have similar interpretations ought not to govern their construction."

After a careful review of the authorities and the principles involved, we are inclined to the views expressed in Judge Sanborn's opinion in

the Colorado Case, which, in its exhaustive consideration of the question, leaves little, if anything, to be added to the discussion. There can be no question that the plaintiff in error was "a common carrier engaged in interstate commerce by railroad," as such commerce has been defined by the decisions of the Supreme Court. Said the court in the Daniel Ball Case, 10 Wall. 566, 19 L. Ed. 999:

"We are unable to draw any clear and distinct line between the authority of Congress to regulate an agency employed in commerce between the states, when that agency extends through two or more states, and when it is confined in its action entirely within the limits of a single state. If its authority does not extend to an agency in such commerce, when that agency is confined within the limits of a state, its entire authority over interstate commerce may be defeated."

It is true that the interstate commerce act is expressly limited in its application to certain defined classes of interstate commerce. But we are unable to discover in that fact any reason for saying that the safety appliance act was intended to be similarly limited. If such was the intention of Congress, the reasonable inquiry is: Why was it not so expressed in terms? Instead of such an express limitation, we find in the act the broad declaration that it shall apply to all railroads engaged in interstate commerce. What warrant have we for holding that the act does not mean what it says? The omission to limit its application as the interstate commerce act was limited is persuasive evidence of the intention of Congress to make it more comprehensive than that act. In the nature of the legislation itself, there was no reason to make it less comprehensive than it was made. The evil intended to be remedied by the act existed in the operation of all railroads. The power of Congress to remedy it extended to all railroads engaged in interstate commerce, and it would be unreasonable to suppose that Congress intended to withhold the benefit of the remedy from the operatives of any road concerning which it had the power to legislate.

In United States v. Freight Ass'n, 166 U. S. 290, 17 Sup. Ct. 540, 41 L. Ed. 1007, the court, answering the objection that the Sherman anti-trust act (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]) should not be held to apply to combinations between railroads, for the reason that, if Congress had intended to inhibit such combinations, it would have done so by amending the interstate commerce act, said:

"The statute [the interstate commerce act] does not cover all cases concerning transportation by railroad, and all contracts relating thereto. It does not purport to cover such an extensive field."

In Johnson v. Southern Pacific Company, 196 U. S. 1, 25 Sup. Ct. 158, 49 L. Ed. 363, the court sustained the act, declaring that its object was not to be defeated by "inadmissible narrowness of construction," and held that, because the car in question in that case "was being regularly used in the movement of interstate traffic," it was within the law, and quoted with approval, as applicable to the construction of the act, the language of Mr. Justice Story, in United States v. Winn, 3 Sumn. 209, Fed. Cas. No. 16,740, as follows:

"I agree to that rule in its true and sober sense; and that is that penal statutes are not to be enlarged by implication or extended to cases not obviously

within their words and purport. But where the words are general, and include various classes of persons, I know of no authority which would justify the court in restricting them to one class, or in giving them the narrowest interpretation, where the mischief to be redressed by the statute is equally applicable to all of them. And where a word is used in a statute which has various known significations, I know of no rule that requires the court to adopt one in preference to another, simply because it is more restrained, if the objects of the statute equally apply to the largest and broadest sense of the word."

The plaintiff in error argues that the decision of the court below rests upon the false premise that to render services to one who is engaged in interstate commerce is to engage in that commerce. But to our view it rests upon a broader basis than this. It rests upon the fact that the movement of the consigned goods to their ultimate destination from the point at which they were shipped in another state was in part conducted upon the road of the plaintiff in error, and that the interstate character of the shipment did not end until the transportation had reached its ultimate completion. The road of the plaintiff in error became a connecting carrier by virtue of the agreement between the consignor and the first carrier, whereby the latter undertook to deliver the goods at San José en route to their ultimate destination. Neither the fact that the consignor of goods originally consigned to San José directed the Southern Pacific Company, prior to their arrival there, to change the destination to a point on the road of the plaintiff in error, nor the fact that the road of the latter was so constructed as to make necessary the unloading and transfer of the goods to its cars, is sufficient to affect the interstate character of the transportation.

The contention is made that all the evidence which was offered in the court below to show that the freight alleged to have been transported by the plaintiff in error had been shipped from points without the state was hearsay. The evidence consisted of bills of lading, waybills, orders for and records of changes in destination, and receipts for freight. A stipulation was entered into between the parties in the court below that the several documents introduced in evidence "might be deemed genuine documents according to the purport thereof, and that, where the same marks or designations occur in different documents, they might be referred to for the purpose of identifying the things which they purported to relate to or describe." The evidence was that the bills of lading were made out at the time of shipment, that they accompanied the shipments, went with the car on which the goods were carried as they passed through the respective divisions, or from one railroad to another, and that sometimes the goods were rebilled and sometimes they just passed from one line to another on the original waybill. The only objection made to the introduction of these documents was that they were incompetent, irrelevant, and immaterial, and did not tend to show that the plaintiff in error at any time was engaged in the transportation of interstate traffic in any of its cars. In view of the stipulation of the parties and the nature of the objection which was made to the evidence, we think that the government was not required to call as witnesses the persons who had physical charge of the transportation in question, or to prove by them that in the course of their duties they had made records of the movements

of the respective cars on which the freight was carried. The documents so admitted under the stipulation may be regarded as entries made in the regular course of business, and in the absence of any offer to disprove their verity we are of the opinion that they were sufficient to sustain the judgment of the court below.

The judgment is affirmed.

NOTE.—The following is the opinion of Wellborn, District Judge, in the court below:

WELLBORN, District Judge. There being no conflict whatever in the evidence in this case, the parties have submitted motions, respectively, for peremptory instructions. Taking them up in the order in which they have been submitted, or in the order in which they were presented, the defendant asks the court to peremptorily instruct the jury to return a verdict for the defendant on all the counts in the complaint. The plaintiff asks that the court peremptorily instruct the jury to return a verdict in its favor on all the counts of the complaint except the eleventh and twenty-third. These two motions are the matters which call on me now for immediate disposition, and, of course, the disposition that I make of these motions will determine the case, because the jury will then be instructed to find or return a verdict in accordance with the conclusions which I announce. I may say, before taking up the merits of these motions, that it is obvious, not only to the court, but even to a casual observer of the progress of this trial, that counsel for both the plaintiff and the defendant have made their researches into the law of the case with great industry, and the presentation of their respective views has been marked by uncommon ability. If I had no jury in the box, and could take the case under advisement for the purpose of preparing an opinion, I should like to review these questions, for the reasons which I have just indicated; but this is impracticable, and I shall not undertake to do any more than to announce my conclusions, with such reference to the law and the facts in the case as may make the announcement intelligible.

The first safety appliance act was passed in 1893 (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]), and this act, as amended April 1, 1896 (Act April 1, 1896, c. 87, 29 Stat. 85 [U. S. Comp. St. 1901, p. 3175]) contains, among others, the following provisions, which are applicable to the case at bar. The first section of the original act reads as follows: "Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, that from and after the first day of January, 1898, it shall be unlawful for any common carrier engaged in interstate commerce by railroad to use on its line any locomotive engine, in moving interstate traffic, unequipped with a power driving-wheel brake and appliances for operating a train-brake system, or to run any train in such traffic after said date, that has not a sufficient number of cars in it, so equipped with power driving-wheel brake, that the engineer from the locomotive drawing said train can control its speed without requiring the brakeman to use the common hand brake for that purpose." I am reading these various provisions, because I think it is well that the jury, as well as counsel, should understand the ruling I am going to make. The second section reads as follows: "Sec. 2. That on and after the first day of January, 1898, it shall be unlawful for any such common carrier to haul or permit to be hauled or used on its line any car used in moving interstate traffic, unequipped with couplers coupling automatically by impact, and which can be uncoupled without the necessity of men going between the ends of the cars." Section 6, as amended in 1896: "That any such common carrier using any locomotive engine running any train, or hauling, or permitting to be hauled or used on its line any car in violation of any of the provisions of this act, shall be liable to a penalty of one hundred dollars for each and every such violation, to be recovered in a suit or suits to be brought by the United States district attorney in the District Court of the United States having jurisdiction in the locality where such violation shall have been committed; and it shall be the duty of such district attorney to bring such suits, upon duly verified information being lodged with him of such violations having occurred, etc."

The act was further amended March 2, 1903 (Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1907, p. 885]), and this last amendment provided, among other things, in section 1 of the act, that the provisions and requirements of the act entitled "An act to promote the safety of employés and travelers upon railroads, by common carriers engaged in interstate commerce," approved March 2, 1893, and amended April, 1896, shall be held to apply to all common carriers by railroad in the territories and in the District of Columbia, and shall apply in all cases, whether or not the couplers operating together are of the same kind, make, or type; and the provisions and requirements hereof, and said act, relating to train brakes, automatic couplers, grab irons, and height of drawbars, shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and in the territories and District of Columbia, and to all other locomotives, tenders, cars, and similar vehicles, used in connection therewith, excepting those trains, cars, and locomotives exempted by the provisions of section 6 of said act of March 2, 1893, as amended by the act of April 1, 1896, and which are used upon street railways.

I am of opinion that that part of the amendatory act of 1896 which provides, "And the provisions and requirements hereof and the said act relating to train brakes, automatic couplers, grab irons, and the height of drawbars, shall be held to apply to all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce, and to all other locomotives, tenders, cars, and similar vehicles, used in connection therewith," broadens the original act of 1893, so as to make its requirements concerning train brakes, automatic couplers, grab irons, and height of drawbars, apply not only to trains, locomotives, tenders, and cars employed in the movement of interstate traffic, but to all trains, locomotives, tenders, and cars used on any railroad engaged in interstate commerce. In other words, for the government to recover under the amendatory act of 1896, it is not necessary, as it was under the original act of 1893, to show that the car with the defective equipment was employed in interstate movement at the time this defect was discovered; but it is only necessary to show that said car was hauled over the line or used by a railroad engaged in interstate commerce. U. S. v. Chicago, M. & St. P. Ry. Co. (D. C.) 149 Fed. 486. The case just cited is the case which was read by Judge Gibson, and which had not been called to my attention previously; but the views which I have announced are in complete accord with the views expressed by Judge McPherson in the case which I have just cited. Unless the amendatory act is so construed, those parts of it last quoted are entirely without effect and useless.

To further illustrate the effect of this amendatory act I will read the following statement by a member of the House of Representatives, while that body had the act under consideration: "Mr. Wanger: Mr. Speaker, the purpose of this act is to make more efficient the provisions of the act of March 2, 1893, for the promotion of the safety of employés upon railways. It has been held by some courts that the tender of a locomotive is not a car, and is therefore not affected by the provisions of the act. It has also been held that the act only applies to cars in interstate movement, and cars are very frequently, although generally designed for and used in the movement of interstate traffic, in use which is not interstate movement that requires the services of operatives upon them. Whenever an action for damages is brought by reason of the death or injury of a railroad employé, of course, every defense is made; and although the car may not be equipped as directed by the Act of Congress, yet that direction, as it stands, only applies when the car is being used in the movement of interstate commerce. Therefore the burden is on the plaintiff in every such action to establish that fact, and is frequently an impossibility, because frequently the injury or death does not happen when the car is so engaged in interstate commerce. It is therefore of the highest importance to make the act of Congress, as everybody supposed it would be, effective, so far as we have the power and authority, for the protection of employés, by requiring the equipment referred to in the act on all cars used on railroads engaged in interstate commerce. That is the purpose of the first section of the bill. The purpose of the second section is to require a more general and uniform use of air and air brakes, so as to have less need for the

operation of hand brakes. The present act, as I recollect it, is that there must be sufficient air-braking apparatus used to enable the engineer to control the train. That, of course, differs, perhaps, in the judgment of every engineer. Therefore it seems appropriate that there should be a certain percentage of the cars of every train required to be operated by air brakes, whether it is actually essential for the proper control of the train or not."

To the same effect, the Interstate Commerce Commission in its Seventeenth Annual Report, at page 84, after the act had become a law: "The necessity of showing that a car was engaged in interstate commerce was another difficulty in the way of enforcing the law. It was necessary to get at the billing showing destination of cars, and to prove in each case that the car complained of was actually moving or used in interstate commerce at the time its defect was discovered. The amendment in question has obviated this difficulty. The law now applies to all equipment on the lines of carriers engaged in interstate commerce, without regard to the service in which it is used."

I am of the opinion that, under said acts as above explained, there were only three things which the government must prove in order to recover: (1) That the defendant, at the times mentioned in the complaint, was a common carrier by railroad, engaged in interstate commerce; (2) that it hauled, or permitted to be hauled, over its lines, the locomotives, trains, and cars mentioned in the several counts of the complaint; (3) that said trains, locomotives, and cars were not provided with the equipment required by said act. There is no controversy as to the existence of the second and third ingredients of the plaintiff's causes of action; nor is there any controversy that the defendant was and is a common carrier by railroad. The only issue between the defendant and the plaintiff is as to whether or not the proof shows that it was engaged, at the times mentioned in the complaint, in interstate commerce.

There is no conflict whatever in the evidence relating to this issue, and from such evidence, following the principles declared in United States v. Colorado & Northwestern R. R. Co., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167, some of which had been previously enunciated in the Daniel Ball Case, 10 Wall. 557, 19 L. Ed. 999, I am satisfied that the defendant was engaged, at the said times, in interstate commerce. The letter of January 25th, of the consignor, the National Tube Company, to the general freight agent of the Southern Pacific Company, asking that the destination of the shipments therein named be changed on their arrival at the place to which they were originally consigned, and the direction contained in the letter or traingram signed "J. M. Brewer," of date January 29th, written more than a month before either of said shipments arrived at San Jose, and some time before they had even reached California, clearly distinguishes the case from Gulf, Colorado & Santa Fé R. R. Co. v. Texas, 204 U. S. 403, 27 Sup. Ct. 360, 51 L. Ed. 540. I may say here that, of course, the actual physical diversion of the shipments was not, and could not have been, made until the arrival of the cars at San Jose, or Los Angeles, or Mojave, whichever may have been the destination; but the agreement between the National Tube Company, the consignor, and the Southern Pacific Company, as evidenced by the letters which I have just referred to—and the Southern Pacific Company was one of the carriers who were parties to the contract for the interstate shipment—this agreement between the consignor and the Southern Pacific Company was consummated when the traingram was sent by the Southern Pacific Company, pursuant to the request of the National Tube Company. the consignor, to the local agent of the Southern Pacific Company at San Jose. After that order had been sent to the agent at San Jose, it was as though the original contract had read that Careaga, or whatever was the point to which it was to be diverted, was the ultimate destination. In other words, the original contract was so changed as to substitute Careaga, or the other points on the defendant's local line, for the points on the Southern Pacific given in the waybill as it was originally executed. I might say that there is another fact that adds some strength, probably, to this conclusion, although the conclusion would have been reached without it—that the testimony of Mr. Garrett, I think it is, showed that the National Tube Company furnished and provided the local agent at San Jose with money to prepay the transportation beyond that point to the new destination under the diversion order.

Recurring now to the case of Gulf, Colorado & Santa Fé Railroad Company v. Texas, 204 U. S. 403, at page 412, 27 Sup. Ct. 360, at page 362, 51 L. Ed. 540, the court said, among other things: "In other words, the transportation which was contracted for, and which was not changed by any act of the parties, was transportation of the corn from Hudson to Texarkana; that is, an interstate shipment. * * * Neither the Harroun nor the Hardin Company changed, or offered to change, the contract of shipment or the place of delivery. * * * No new arrangement having been made for transportation, the corn was delivered to the Hardin Company at Texarkana. Whatever may have been the thought or purpose of the Hardin Company in respect to, the further disposition of the corn was a matter immaterial, so far as the completed transportation was concerned." It is a fair inference from this quotation that, if the original contract of shipment had been changed by the parties, so as to substitute Goldthwaite for Texarkana, the decision of the court would have been different; and I am of opinion that the changes of destination shown in the case at bar by the letters above mentioned are the situations which, it is to be inferred from the language of the Supreme Court in the case last cited, would have made the transportation there involved an interstate matter, and, in my opinion, bring the case at bar fully within United States v. Colorado & Northwestern R. R. Co., supra.

From the views above expressed as to the law of the case, there being no conflict in the evidence relating to the facts, it follows that the defendant's motion must be denied, and the plaintiff's motion for peremptory instructions must be allowed; and orders to that effect will be accordingly entered.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes