UNITED STATES ex rel. ATTORNEY GENERAL v. UNION STOCKYARD & TRANSIT CO. OF CHICAGO et al.

(Commerce Court. November 14, 1911. On Petition for Rehearing, February 13, 1912.)

No. 15.

1. COMMERCE (§ 27*)—CARRIERS SUBJECT TO INTERSTATE COMMERCE ACT—TERMINAL RAILROAD COMPANY—"ENGAGED IN THE TRANSPORTATION OF PROPERTY FROM ONE STATE TO ANOTHER."

The Chicago Junction Railway Company, as lessee, operates the railroad owned by the Union Stockyard & Transit Company of Chicago, which consists of some 250 miles of tracks in Chicago, wholly within the state of Illinois, connecting with the tracks of interstate trunk line railroads, and extending to the Union Stockyards and some 650 different industrial establishments in the stockyards district. It is organized under the general railroad law of the state, and its business is to haul cars between receiving tracks on the trunk line roads and the stockyards and industrial plants, from which the shipments are made or to which they are consigned, for which it receives a flat rate per car, in all cases paid by the trunk line company and absorbed in its own charges. *Held,* that such company is- a common carrier "engaged in the transportation of property from one state to another" by rail within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104, § 1. 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), and subject to the provisions of sections 6 and 20. as amended by sections 2 and 7, of such act, requiring such carriers to file schedules of rates and to make reports, when required by the Interstate Commerce Commission. (Archbald, Judge, dissenting.)

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*]

2. COMMERCE (§ 27*)—CARRIERS ENGAGED IN INTERSTATE COMMERCE—"ENGAGED IN THE TRANSPORTATION OF PROPERTY FROM ONE STATE TO ANOTHER."

Interstate commerce begins with the shipment of an article in one state directed and destined to another state, and ends only with the delivery at destination. All common carriers by railroad, which participate in its actual transportation from the time of shipment to the time of delivery, are "engaged in the transportation of property from one state to another," within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), whether their services be performed wholly in one state or in more than one state, whether their services be primary, and called "carriage," or incidental, and called "switching," whether the carrier be paid a flat sum per car or a percentage of the through rate, and whether such payment be made directly by the shipper or consignee on the one hand, or by the initial or final carrier on the other.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. § 25; Dec. Dig. § 27.*]

3. CARRIERS (§ 24*)—INTERSTATE COMMERCE ACT—REPORTS FROM OWNERS OF RAILROADS ENGAGED IN INTERSTATE COMMERCE.

The owner of a railroad, which is leased and operated by the lessee as a common carrier engaged in interstate commerce, may be required by the Interstate Commerce Commission to make annual reports, under

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Interstate Commerce Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386 (U. S. Comp. St. 1901, p. 3169), as amended by Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 (U. S. Comp. St. Supp. 1909, p. 1163).

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 60–66; Dec. Dig. § 24.*]

**4. Carriers (§ 24*)—Interstate Commerce Act—Companies Subject to Act —Stockyards Company—"Common Carrier."**

A stockyard company, which receives live stock from carriers at its yards, pens, feeds, and cares for the same, and maintains a public market for its sale, and which unloads and reloads it when required, receiving fixed prices for its services, is not a "common carrier," within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149).

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 24.*

For other definitions, see Words and Phrases, vol. 2, pp. 1313–1319; vol. 8, p. 7607.]

**5. Carriers (§ 24*)—Interstate Commerce Act—Construction—"Common Carrier" Defined.**

The term "common carrier," as used in Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), is to be given its ordinary meaning of one engaged in the actual work of transportation; and a corporation not so engaged is not within the statute merely because it is authorized by its charter to engage in such business.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 24.*]

**6. Carriers (§ 24*)—Interstate Commerce Act—Corporations Subject to Act—"Common Carrier."**

A stockyards company, authorized by its charter to build and operate a railroad, and which did build and operate one in interstate commerce, on leasing its line and equipment for a term of years to an independent operating company, ceased to be a "common carrier" engaged in interstate commerce, within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), and is not subject to the provisions of the act as such because it receives as rental a share of the net earnings of its road, nor because the owner of a majority of its stock also owns a majority of the stock of the lessee.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 24.*]

**7. Carriers (§ 24*)—Interstate Commerce Act—"Common Carrier"—Stock-holding Company.**

A holding company is not a "common carrier," within the meaning of Interstate Commerce Act Feb. 4, 1887, c. 104, § 1, 24 Stat. 379 (U. S. Comp. St. 1901, p. 3154), as amended by Act June 29, 1906, c. 3591, § 1, 34 Stat. 584 (U. S. Comp. St. Supp. 1909, p. 1149), because of the fact that it owns all of the stock of a corporation which is such a common carrier.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 60–66; Dec. Dig. § 24.*]

**8. Carriers (§ 34*)—Discrimination in Rates—Suit to Restrain.**

Elkins Act Feb. 19, 1903, c. 708, § 3, 32 Stat. 848 (U. S. Comp. St. Supp. 1909, p. 1140), authorizes a suit in equity by the United States to restrain a violation of the act by discrimination or the giving of rebates

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

only if a common carrier subject to its provisions is charged with the violation thereof and is sought to be enjoined.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 34.*

What constitutes an unlawful preference or discrimination by a carrier under interstate commerce regulations, see note to Gamble-Robinson Commission Co. v. Chicago & N. W. Ry. Co., 94 C. C. A. 230.]

9. CARRIERS (§ 34*)—INTERSTATE COMMERCE ACT—ANNUAL REPORTS FROM CARRIERS—MANDAMUS TO COMPEL.

Under Interstate Commerce Act Feb. 4, 1887, c. 104, § 20, 24 Stat. 386 (U. S. Comp. St. 1901, p. 3169), as amended by Act June 29, 1906, c. 3591, § 7, 34 Stat. 593 (U. S. Comp. St. Supp. 1909, p. 1163), which authorizes the Interstate Commerce Commission to require annual reports from common carriers subject to the act, and to maintain suits to compel compliance with its provisions by mandamus, an order requiring such a report is a condition precedent to a suit for a mandamus to compel it to be made.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 34.*]

Petition for mandamus, on relation of the Attorney General, against the Union Stockyard & Transit Company of Chicago and others. Writ of mandamus granted against defendant Chicago Junction Railway Company, and petition dismissed as against all other defendants.

Blackburn Esterline and William E. Lamb, Sp. Asst. Attys. Gen (James A. Fowler, Asst. Atty. Gen., on the brief), for the United States.

Ralph M. Shaw (John Barton Payne and Silas H. Strawn, on the brief), for Union Stockyard & Transit Co. of Chicago and Chicago Junction Ry. Co.

W. D. Guthrie for Chicago Junction Railways & Union Stockyards Co.

Willard M. McEwen, for Louis Pfaelzer & Sons.

Before KNAPP, Presiding Judge, and ARCHBALD, CARLAND, HUNT, and MACK, Associate Judges.

MACK, Judge.    This proceeding is brought to compel the Union Stockyard & Transit Company of Chicago (hereinafter called the "Stockyard Co.") and the Chicago Junction Railway Company (hereinafter called the "Junction Co.") to file with the Interstate Commerce Commission tariffs in conformity with section 6, and reports and statements in conformity with section 20, of the act to regulate commerce (Act Feb. 4, 1887, as amended June 29, 1906 [34 Stat. 586, 593]), and of the rules and regulations adopted by the Commission pursuant thereto, and to enjoin the Stockyard Co. and the individual defendants comprising the firm of Louis Pfaelzer & Sons (hereinafter called "the Pfaelzers") from carrying out the terms and provisions of a contract made by them, and the Chicago Junction Railways & Union Stockyards Company (hereinafter called the "Investment Co.") from carrying out its written guaranty of this contract.

The case has been heard on petition and answer.    While the answers of the Stockyard Co. and the Investment Co. neither admit nor deny certain allegations as to the activities of the Junction Co., which the latter in its answer admits to be true, and while no testimony has

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

been offered in the case, it has been presented, both in the briefs and oral arguments by all counsel, on the basis of the truth of those allegations that are so confessed by the Junction Co. We have, therefore, considered the petition, as against each defendant, in this light.

Although the petition is clearly multifarious in joining mandamus proceedings, authorized by the act to regulate commerce, to secure compliance with its provisions, and injunction proceedings, authorized by section 3 of the act to further regulate commerce, known as the "Elkins Act" (Act Feb. 19, 1903, 32 Stat. 848), to restrain an alleged illegal rebate and discrimination, inasmuch as defendants do not raise this objection, we shall, without approving such practice, proceed to a determination of the petitioner's rights under both aspects of the case.

The Stockyard Co., a corporation organized in 1865 by a special, but public, act of the state of Illinois, was thereby authorized, not only to maintain stockyards and a hotel, but also to construct and maintain railway lines, tracks, and switches, so as to connect its yards, then outside of the city of Chicago, with the tracks of all railroad lines entering Chicago within prescribed limits; to maintain the railroad, and to transport and allow to be transported thereon, between such railroads themselves, as well as between its yards and such railroads, property of every kind; to fix the rates of toll, provided "all fees and charges for freight * * * shall be subject to any general law * * * in reference * * * to railroads." It was further authorized to maintain its lines of railway across public streets and highways, and was given power of condemnation. The act provided that nothing therein contained should be construed as giving authority to maintain or operate a railroad for the conveyance of passengers or freight in the city of Chicago; but since 1865, the date of the charter, the city of Chicago has been extended so as to cover all of the property of the Stockyard Co.

It was further authorized by the charter to lease its property. Pursuant to this authority, it entered into an agreement with the Junction Co., a corporation organized under the general railroad act of the state of Illinois, whereby, in 1897, it, in effect, leased to the Junction Co. all of its railroad and railroad equipment for a term of 50 years. Under the agreement the Junction Co. obligated itself to conduct, operate, and manage the property; to perform all duties pertaining to a railroad, or of a railroad character, imposed upon the Stockyard Co.; and to pay, as rental, two-thirds of the entire net earnings and revenue derived by it from the operation of all its lines of railroad and railroad track. The Junction Co. further obligated itself to submit its books and papers showing its operations to the nominee of the Stockyard Co.

The Junction Co., at the time of the lease and for 10 years thereafter, was the owner of other railroad property, and was concededly a common carrier, within the act to regulate commerce. In 1907, however, it sold all of its other property. Since that time its sole business has been the operation of the railroad so acquired from the Stockyard Co., lying wholly within the state of Illinois, in substantially the same manner as it had been operated, prior to the lease, by the Stockyard Co.

The line of road consists of certain main tracks, running east and west from a point on the lake front in the city of Chicago near the intersection of Thirty-Ninth street with the tracks of the Illinois Central Railroad, and thence in a general westerly and northwesterly direction to a point some 8¼ miles distant from the lake, all in the state of Illinois; its parallel main tracks between these points aggregating about 40 miles. The Union Stockyards are located about 2 miles from the lake front, and, in addition to connecting with these yards, the Junction Co. also has switch tracks to other industries located at or near there, aggregating some 250 miles, by means of which main and switch tracks it serves in the neighborhood of 650 industries; all being in or near what is known as the "stockyards district" of Chicago.

According to the record in this case, the Junction Co. neither receives goods for carriage on its own account nor deals on its own account with shippers or consignees. It is not necessary for the purposes of this decision to enumerate all of its activities in the operation of the road. Among them is the hauling of loaded cars on behalf of trunk line carriers, by whom it is employed and paid, from such trunk lines to the industries on its tracks, or to other trunk lines connecting with it. These cars are brought by the trunk line carriers from points outside of the state destined to points in the district served by it or to points outside of the state. They are placed by the incoming trunk line roads on what are known as the "receiving tracks" of the Junction Co.; each car being marked with a transfer card, giving the name of the consignee of the freight therein contained, and thus indicating its destination. The Junction Co. picks them up with its own motive power and transports and delivers either to the designated consignee or industry on its line, or, when destined to points beyond the state limits, to the proper outgoing trunk line. These cars are transported in one unbroken line of railroad carriage from the several points where they originate outside of the state, over the line of the Junction Co. after their arrival at Chicago, to the railroad of the outgoing connecting carrier, and then to their points of destination outside of the state. This is done without the intervention of the shipper or consignee, or the performance by either of them of any intermediate act or service; and they move in this way on through bills of lading, covering the whole distance traversed, as do those also which are consigned and delivered to consignees and industries on the line of the Junction Co. in the stockyards district.

For the hauling or so-called switching service so rendered, the Junction Co. is paid by the trunk line carriers which request the service a specified sum according to an established schedule of tariffs or charges. For instance, for the switching of cars back and forth to and from the receiving tracks of the various connecting trunk lines to the stockyards, or to the industries in that vicinity, the Junction Co. is paid a certain sum per car by the trunk line carriers, and this it receives as a distinct switching charge, regardless of the commodity or character of freight in the car, its origin, destination, or the through freight charge of the trunk line carriers. No specific charge therefor

is made to the shipper or consignee, either by the Junction Co. or by the trunk line company. The trunk line is said to absorb the charge.

Since the lease of 1897, the Stockyard Co. has had nothing whatever to do with the railroad or railroad business, which has been carried on exclusively by its lessee. It has confined itself, apart from the operation of the hotel, to conducting a stockyards business, with all which this involves and implies. It is not a dealer in cattle, but simply maintains a public market, where all kinds of live stock can be bought and sold. As part of this business it receives and cares for stock delivered by trunk line carriers at its docks and chutes, unloading them for a specific amount per car paid to it by the carriers. The stock, so unloaded at its yards, is mostly stock consigned on through bills of lading to parties doing business in and around the stockyards or stockyards district, which has been transported by the carriers from points outside of the state to the stockyards or to points on the line of the Junction Co. It also loads onto cars furnished by the trunk line carriers stock outbound from the yards, for which it similarly receives a fixed sum per car from the carrier for which it performs this loading service; the stock so loaded being generally consigned from owners and dealers doing business in and about the stockyards district and being moved on through bills of lading over the Junction Co. tracks to the tracks of the trunk line carriers, which haul them to points of destination beyond the limits of the state. The Stockyard Co. also loads and unloads live stock consigned to or shipped by industrial establishments located along the right of way of the Junction Co., for which service the trunk line carrier that handles the shipment pays a fixed sum per car. By reason of these facilities and business arrangements both live and dead freight is moved in an unbroken line of railroad carriage on through bills of lading from points outside of the state of Illinois to the stockyards and industrial establishments located in that vicinity, and from such stockyards and industrial establishments to outside points. The Stockyard Co., however, neither issues bills of lading for these shipments, whether through bills or others, nor participates in the freight rates charged by the carriers. It is compensated solely in the manner indicated for the services which it performs. It does advance to the carriers, however, the freight charges due on bills of lading for stock delivered at the stockyards, collecting the same in turn from the consignees. But these advancements are made for the convenience and accommodation of its customers, the commission men, who buy and sell stock at its yards, and have nothing whatever to do with the charges which it makes for loading and unloading. These are paid by the trunk line carriers as a separate matter. As part of its stockyards business the Stockyard Co. further frequently feeds and waters live stock in transit, for which it is similarly paid a fixed compensation by the carrier handling the stock to and from its yards. And it also feeds, beds, and waters live stock shipped to consignees doing business at or near its yards, for which it is paid by the commission men who are engaged at its yards in buying and selling cattle. It also frequently makes alterations and repairs in cattle cars, for which it is paid by the carrier requesting the service. And, finally, for the accommodation of

its patrons it has built and conducts a hotel in the neighborhood of its yards, as empowered by its charter.

The Investment Co. is a corporation organized under the laws of the state of New Jersey solely as an investment company, for the purpose, among other things, of holding stock of the Stockyard Co. It owns over 90 per cent. of this stock, as well as practically all of the stock of the Junction Co.; but it owns none of the property of, and neither manages nor controls either company, except in so far as its stock ownership enables it to elect their directors.

The contract between the Stockyard Co. and the Pfaelzers in substance obligates the former to pay $50,000 to the latter in order to enable them to rebuild their packing plant at a specified place in the neighborhood of the Stockyard Co.'s premises. In consideration thereof the Pfaelzers bind themselves to rebuild the plant, to conduct their business exclusively at the specified place, and either to buy all live stock slaughtered or packed by them in or within 200 miles of Chicago, for a period of 15 years, at the yards of the Stockyards Co., or, in lieu thereof, to pay it the same customary yardage, tolls, and charges that it would receive if such live stock were sent to its yards and there bought by them.

The questions presented on this record are:

First. Is the Junction Co. a "common carrier engaged in transportation of property by railroad from one state to another state of the United States," within section 1 of the act to regulate commerce, and therefore subject to the provisions of sections 6 and 20 thereof?

Second. Is the Stockyard Co. the "owner of a railroad engaged in interstate commerce," within such section 20, and therefore subject to its provisions?

Third. Is the Stockyard Co. a common carrier, within such section 1, and therefore subject to section 6 thereof, and also to the provisions of section 3 of the Elkins act?

Fourth. Is the Investment Co. such a carrier, and therefore subject to section 3 of the Elkins act?

Fifth. Are the contract and guaranty a violation of the act to regulate commerce, or of the Elkins act?

[1] First. Counsel for the Junction Co. expressly concede in this case that it is a common carrier. They deny, however, that it is engaged in interstate commerce. Counsel for other defendants, while not expressly denying, nevertheless intimate, that it is not a common carrier.

That it is a common and not a private carrier, if it be a carrier at all, is manifest from the fact that it is organized under the general railroad law of Illinois. Under its Constitution (article 11, § 12) all railroads are "declared public highways and shall be free to all persons for the transportation of their persons and property thereon, under such regulations as may be prescribed by law." Moreover, it offers its services by the publication of a tariff in general circulation in Chicago to all the public who are in a position to avail themselves thereof. That the class is a limited one does not affect the nature of the business, or render it any the less public or common in its character.

It is, however, suggested that it is not a carrier at all, because what

it hauls is the loaded car, and not the freight itself with which the car is loaded. That cars, as well as other property, may be the subject-matter of carriage, is, however, well established. P. & P. U. Ry. Co. v. C., R. I. & P. Ry. Co., 109 Ill. 135, 50 Am. Rep. 605; M. P. Ry. Co. v. C. & A. Ry. Co. (C. C.) 25 Fed. 317; U. S. v. C. & N. W. Ry. Co. (D. C.) 157 Fed. 616, 619.

It is further contended that the trunk line alone is the carrier, and that the Junction Co. is merely its agent and instrumentality, and only as such agent performing, not a transportation or carriage, but a mere switching service. This service is likened to that of a towboat, which, under some circumstances and in some jurisdictions, is held not to be a carrier.

That the trunk line has agreed to carry beyond its own line, and has expressly assumed a liability for the acts of connecting carriers, which, under the so-called Carmack amendment to section 20 of the act to regulate commerce (Act June 29, 1906, 34 Stat. 595), the law would now impose upon it as the initial carrier, does not, however, render the connecting carrier any the less the transporter or carrier of the property while it is actually hauling the loaded car on its own tracks, with its own motive power and its own servants, absolutely free from any control or direction on the part of either trunk line. To call this service a switching service does not, in any respect, change its character; whether the work done be to switch a car 1 mile or to haul it 200 miles, it is none the less a transportation or carriage of the car and its contents by an independent operator. As was well said in M. P. Ry. Co. v. Grocery Co., 55 Kan. 525, 40 Pac. 899:

"A railroad transporting a car load of freight 1 mile, using a switching engine for motive power, is just as much a common carrier as if the distance were 1000 miles by regular freight train. The fact that compensation for this particular service was paid by the St. Louis & San Francisco Railway Company, while it might render that company also responsible, could not relieve defendant company from its liability as a carrier."

If, then, it be a common carrier of this property, it must be immaterial how or by whom it is paid. Whether its rate is a flat one, or a proportion of the through rate, whether it is paid by the trunk line and absorbed, or by the shipper or consignee, does not determine the nature of its services or alter the character of its offer to the public— to serve them as a common carrier.

The Interstate Commerce Commission in Cattle Raisers' Association v. F. W. & D. C. Ry. Co., 7 Interst. Com. R. 513, 536, 537, while holding, as counsel urge, that this very Stockyard Co., under which the Junction Co. holds by lease, was not, prior to the lease of 1897, a common carrier in certain of its activities, also expressed the opinion, which counsel have not noted, that it was a common carrier with reference to the activities hereinabove described and now performed by the Junction Co. The Commission, moreover, point out that the Bridge Co., in K., & I. Bridge Co. v. L. & N. Ry. Co. (C. C.) 37 Fed. 567, 2 L. R. A. 289, which is here relied upon, was not, under its act of incorporation, a common carrier at all.

In Union Stockyards Co. of Omaha v. U. S., 169 Fed. 404, 94 C. C. A. 626, the Circuit Court of Appeals, while holding, as counsel

claim, that the Stockyard Co. of Omaha was not a common carrier in its stockyards activities, also held that, as to its railroad activities, which are identical with those of the Junction Co., it was a common carrier engaged in interstate commerce, within the safety appliance law (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. St. 1901, p. 3174]). On this point, Mr. Justice Van Devanter said:

"It is the contention of counsel for the stockyards company that the service performed by it is such only as the railroad companies are bound to perform for their patrons; that, having no facilities for performing this service at South Omaha, the railroad companies merely employ the stockyards company to furnish the requisite facilities and to operate them; that the performance of this service under such an employment does not make the stockyards company a common carrier, or its property used therein a railroad; and that this service is purely a local switching service, which follows or precedes transportation, and is not interstate commerce. * * * It is of little significance that the stockyards company does not hold itself out as ready or willing generally to carry live stock for the public, for all the railroad companies at South Omaha do so hold themselves out, and it stands ready and willing to conduct, and actually does conduct, for hire a part of the transportation of every live stock shipment which they accept for carriage to or from that point, including such shipments as are interstate."

Belt Ry. Co. of Chicago v. U. S., 168 Fed. 542, 93 C. C. A. 666, 22 L. R. A. (N. S.) 582, U. S. v. Sioux City Stockyards Co. (C. C.) 162 Fed. 556, U. S. v. Union Stockyards Co. (D. C.) 161 Fed. 919, and the dictum in McNamara v. Wash. Terminal Co. (D. C.) 39 Wash. Law Rep. 458, are in accordance with the decision of Mr. Justice Van Devanter, and hold a company performing these activities, not only a common carrier, but also engaged in interstate commerce within the safety appliance or employer's liability acts.

If, then, the Junction Co. be, at least as to some of its activities, a common carrier, is it also "engaged in the transportation of property by railroad from state to state"? Its location wholly within one state, the switching nature of its activities, which are said to be merely incidental to the transportation within that state, and its failure to receive a division or definite percentage of the through interstate rate, are urged in support of the contention that it is not engaged in transportation from one state to another.

Counsel, moreover, contend that the amendment of June 29, 1906, to the first section of the act to regulate commerce, narrows the class of railroads wholly within one state that are now subject to the act. Prior to the amendment, the act read:

"Common carriers engaged in the transportation of property wholly by railroad, or partly by railroad and partly by water, when both are used under a common control, management, or arrangement for a continuous carriage or shipment, from one state to any other state."

By the amendment of 1906 the clause beginning "or partly" and ending with the word "shipment" was inclosed in parentheses.

It is urged that, under the correct construction of the original section 1, a railroad, even though wholly within one state, came within the act if it carried freight within that state under a common arrangement with an interstate carrier, but that, since under the amendment the common arrangement refers only to transportation partly by water

and partly by rail, a carrier operating wholly by rail and within one state does not come within the amended act, even though it operate under such a common arrangement; in other words, that only railroads whose lines cross state boundaries are now subject to the Commission.

The case of C., N. O. & T. P. Ry. Co. v. I. C. C., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935, does not, however, sustain the contention that prior to the amendment the clause "under a common control," etc., affected as well the carriage wholly by railroad as the carriage partly by railroad and partly by water. U. S. v. Colo. & N. W. Ry. Co., 157 Fed. 321, 329, 332, 85 C. C. A. 37, 15 L. R. A. (N. S.) 167.

Whatever be the true construction of section 1 as originally framed —and we agree with the Circuit Court of Appeals in U. S. v. Colo. & N. W. Ry. Co., 157 Fed. 321, 327, 85 C. C. A. 27, 33 (15 L. R. A. [N. S.] 167), that "it is probable that the clause 'under a common control,' etc., qualified carriers 'partly by railroad and partly by water' only, and had no application to such carriers 'wholly by railroad'"— it is clear that the sole purpose of the amendment was to remove any possible doubt on this point, and not to withdraw from the operation of the act railroads wholly within one state, but engaged in the transportation of articles while moving in interstate commerce, whether with or without a common arrangement with connecting lines. U. S. v. C. & N. W. Ry. Co., supra, 157 Fed. 328, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167.

[2] The interstate commerce begins with the shipment of the article in one state directed and destined to another state. It ends only with the delivery at destination. All common carriers by railroad which participate in its actual transportation from the time of shipment to the time of delivery are engaged in the transportation of property from one state to another, whether their services be performed wholly within one state or in more than one state, whether such services be primary, and called "carriage," or incidental, and called "switching," whether the carrier be paid a flat sum per car or a percentage of the through rate, and whether such payment be made directly by the shipper or consignee on the one hand, or by the initial or final carrier on the other hand. U. S. v. Ill. Term. Ry. Co. (D. C.) 168 Fed. 546; Pac. Coast Ry. Co. v. U. S. 173 Fed. 448, 98 C. C. A. 31.

While it is conceded that the cases above cited support these views, at least when the safety-appliance acts are in question, it is sought to distinguish most of them on the ground that the safety-appliance acts and the interstate commerce act have a different purpose and scope; that the former are intended primarily to regulate the cars at any time used in interstate commerce, and not primarily the carriers themselves in their relation to the public. Some statements from the decision of Judge Sanborn (U. S. v. C. & N. W. Ry. Co., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167) to the effect that the two acts are not in pari materia, and therefore not necessarily to be construed alike, are cited in support of this contention. The argument, however, which was answered in that opinion, was as follows: The original interstate commerce act subjected to the control of the Interstate

Commerce Commission a carrier by railroad within one state only if it operated under a common arrangement with a carrier in another state. That act was passed in 1887. In 1893 the first safety-appliance act was passed. In terms it applied to every "carrier by railroad engaged in interstate commerce." Nevertheless, as it, too, subjected carriers to the control of the Commission, the broad language must be deemed limited to the class of carriers affected by the act of 1887, because the act of 1887 clearly declared the intent of Congress as to the extent of the class over which the Commission should have control.

The answer to this argument, given by the court, was twofold: First. The major premise, though adopted by some courts, was erroneous. All common carriers engaged in interstate transportation wholly by railroad were embraced within the terms of the original act to regulate commerce. Second. Even if it were correct, there was no such relation between the two acts as to cause the court to modify the broad language of the safety appliance act by expressly inserting therein the limitation of the interstate commerce act. It is manifest that this decision does not support the contention of counsel.

Again, it is said that the safety appliance act as now amended (Act March 2, 1903, c. 976, 32 Stat. 943 [U. S. Comp. St. Supp. 1909, p. 1143]) requires all cars engaged in interstate commerce, whether owned by an interstate railroad or by a private individual not engaged in the transportation business, to be equipped as therein directed. But, whatever the scope of the act may be (So. Ry. Co. v. U. S., 222 U. S. 20, 32 Sup. Ct. 2, 56 L. Ed. ——, Oct. 31, 1911) only the "common carrier engaged in interstate commerce" is punishable for its violation. Cases holding companies whose activities are the same as those of the Junction Co. guilty of such a violation are therefore direct authorities on the question now under consideration.

As, therefore, the designation used in the several acts, "carrier engaged by railroad in interstate commerce" and "carrier engaged by railroad in the transportation of property from one state to another," are not mutually exclusive, but, on the contrary, the one includes the other, and as all of the authorities cited to or found by us expressly hold that such of the activities of the Junction Co. as are hereinabove set forth make it a common carrier engaged in interstate commerce by railroad, we are of the opinion that it is a common carrier engaged in the transportation of property from one state to another, within section 1 of the act to regulate commerce, and as such subject to the requirements of section 6 and section 20 of that act.

[3] Second. By the amendment of June 29, 1906, the commission was authorized, under section 20, to require annual reports, not only "from all common carriers subject to the provisions of this act," but also "from the owners of all railroads engaged in interstate commerce as defined in this act." This is the only section of the act that refers to the *owners* of the railroad as distinguished from the common carrier. The evident purpose of Congress was to enable the Commission to obtain certain information which the lessee operator might be unable to give, but which the owner of a railroad, either operated by a common carrier engaged in interstate commerce as defined in the act or which is a highway of interstate commerce, could furnish. Which-

ever be the true construction of this clause (So. Ry. Co. v. U. S., supra), the Stockyard Co., as lessor, is the owner of such a railroad, and therefore comes within the provisions of section 20. What the obligations are which that section imposes upon such owners we are not now called upon to decide.

[4] Third. None of the present activities of the Stockyard Co. as the owner and manager of the stockyards and hotel business, hereinabove fully detailed, in our judgment make it a common carrier. The facilities which it affords may enter to a certain extent into the carriage of live and dead stock by the railroads with which it has occasion to deal, and the services which it renders in that connection may take on a public character. Cotting v. Kansas City Stockyards, 183 U. S. 79, 85, 22 Sup. Ct. 30, 46 L. Ed. 92. But that does not affect the case. A carrier must transport or carry. It must actually engage, in other words, in the carriage of goods or persons from point to point, of which there is no semblance in anything which is done here. Union Stockyards v. U. S., 169 Fed. 404, 406, 94 C. C. A. 626.

[5] It is said, however, that the charter of the Stockyard Co. contemplated that it should build and operate a railroad to connect with the trunk lines which enter Chicago, and empowered it so to do, and that it cannot escape this charter obligation or put off the character of a common carrier thereby impressed on it, either by not exercising the power or by turning over to another company the railroad which it built. The corporate character of a company—and much less the business in which it is engaged—is not determined by its reserved and unused powers. Tiffany v. La Plume Condensed Milk Co. (D. C.) 141 Fed. 444; Cate v. Connell, 173 Fed. 445, 97 C. C. A. 647. It is what it does, and not simply what it may do, by which it is to be judged. A corporation would in no sense be a common carrier, if it never constructed or ran a railroad or other means of transportation, merely because it had the charter power. But the Stockyard Co. did exercise such power. It built and operated the railroad. It was, at that time, a common carrier. Cattle Raisers' Ass'n v. F. W. D. C. Ry. Co., supra. It has, however, pursuant to its charter power, leased its entire railroad property. Thereupon the railroad, with the locomotives and cars required to run it, went out of the possession and control of the Stockyard Co., which thereafter confined its operations to the stockyard business under its other charter powers. Clearly the mere reversionary ownership of the railway, which it retained, did not make it a carrier, or impose upon it the obligations or duties of a carrier.

[6] While under the law of Illinois (Penn. Co. v. Ellett, Adm'r, 132 Ill. 654, 24 N. E. 559) and of some other states a lessor is liable like a common carrier for damages caused by its lessee, an independent operating company, the weight of authority appears to be contrary to this view (1 Elliott on Railroads, § 468). In any event, the Federal Courts in Illinois have refused to follow the Illinois doctrine (Yeates v. Ill. Central Ry. Co. [C. C.] 137 Fed. 943; Curtis v. C., C., C. & St. L. Ry. Co. [C. C.] 140 Fed. 777), on the ground that this is a question of general law. Moreover, whatever may be the liability of a lessor railroad for damage to persons or property while being transported over the railroad owned by it, but operated by a lessee, that

liability, if any, is due to the obligations imposed upon it by the state. The state may declare that a nonoperating lessor shall be liable to the same extent as a common carrier for such damages. It cannot, however, by such a declaration, make the lessor a common carrier in fact, within the meaning of the act to regulate commerce. "Common carrier," as therein used, is to be taken in its ordinary signification of the one engaged in the actual work of transportation; that is, the operating company. Any doubt that may theretofore have existed on this point is, in our judgment, removed by the amendment of 1906 to section 20 of the act, whereby, in express terms, the owner of a railroad engaged in interstate commerce is referred to in contradistinction to the common carrier subject to the act. The decision of the Interstate Commerce Commission in Independent Refiners' Ass'n v. P. R. Co., 6 Interst. Com. R. 52, in so far as it holds the lessor, merely as lessor, liable for the lessee's violation of its obligations under the interstate commerce act, is not to be supported.

The commission in that case, however, based the liability of the lessor also on the fact that it received as rental, not a fixed annual sum, but one-half of the gross revenues. A holding of the Circuit Court for the Western District of Pennsylvania, in accordance with this ruling of the Commission, that lessor and lessee thereby were to be deemed in a sense joint operators, was, however, reversed in the Circuit Court of Appeals. Western N. Y. & P. R. Co. v. Penn Refining Co., 137 Fed. 343, 356, 70 C. C. A. 23. There would seem to be no difference in the relation between a lessor and a lessee, when, as in that case, the rental is a percentage of the gross receipts, and when, as in this case, the rental is a percentage of the net receipts. The test of a joint operation by lessor and lessee corporations, like that of a partnership between individuals, is not a sharing merely in the net profits of the enterprise. Holmes v. Old Colony R. R. Co., 5 Gray (Mass.) 58. The Stockyard Co. cannot be deemed a joint operator with the Junction Co., and therefore a common carrier within the act to regulate commerce, merely because it receives two-thirds of the net revenues of the Junction Co. or because its auditor acts for both companies.

Even if the Investment Co., by reason of its ownership of the stock of the Junction Co., could be held to be in such control of the Junction Co. as, for some purposes, to make the two identical, nevertheless the Stockyard Co. would not thereby, and through the ownership by the Investment Co. of 90 per cent. of its stock, become a common carrier. It was the common carrier's ownership of 99 per cent. of the stock of the Wharf Co., organized for the very purpose of furnishing it terminal facilities as a part of the interstate system, that, in Southern Pacific Terminal Co. v. I. C. C. & Young, 219 U. S. 499, 31 Sup. Ct. 279, 55 L. Ed. 310, was held to make the Wharf Co. a part of the common carrier's system, and therefore a common carrier subject to the act. We see no analogy to the situation in this case.

[7] Fourth. The Investment Co., whatever may be its control over the Junction Co. or the Stockyard Co., cannot, in any sense, be deemed a common carrier. Its ownership of the entire stock of the Junction Co. would not make it, any more than such ownership would make an individual, a common carrier. It might be termed, in a sense, the

owner of a common carrier; but, as it is not itself a common carrier, it does not, in our judgment, come within section 1 of the interstate commerce act, or section 3 of the Elkins act.

[8] Fifth. While section 1 of the Elkins act as amended (Act June 29, 1906, 34 Stat. 584, 587), after prohibiting "any person or corporation" from rebating or discriminating in respect to an interstate transportation, subjects to criminal prosecution "any person or corporation, whether shipper or carrier," who knowingly violates its provisions, section 3 of the Elkins act, under which this suit is brought, authorizes equity proceedings to enjoin such offenses only when a "common carrier" has committed or is about to commit them. If the decision in I. C. C. v. Reichmann (C. C.) 145 Fed. 235, correctly holds that one who is neither shipper nor carrier can be prosecuted under section 1—as to which we intimate no opinion—the question whether the proposed payment to the Pfaelzers could in any way be deemed such a rebate or discrimination could be tested by proceedings thereunder in the proper forum. We have found it unnecessary to determine or even to consider it, in view of our conclusion that neither the Stockyard Co. nor the Investment Co. is a common carrier.

[9] Section 6 of the interstate commerce act imposes a positive duty on common carriers subject thereto in respect to the filing of tariffs and other documents. Section 20, on the other hand, merely authorizes the Commission to require reports from common carriers and owners of railroads engaged in interstate commerce. There is no allegation in the petition filed in this cause that the Interstate Commerce Commission in any manner, either by general or special order or otherwise, has ever required the Junction Co. or the Stockyard Co. to furnish any such reports as are contemplated under section 20. In the absence of such an order, no mandamus to make such reports can be issued by this court.

It follows, therefore, that the petition must be dismissed, not only as against defendants other than the Junction Co. and the Stockyard Co., but also as against the Stockyard Co., and the relief prayed for under section 20 of the act must be denied as against the Junction Co. The mandatory writ will be issued against the Junction Co., as a common carrier subject to the act, to comply with its obligations under section 6 thereof.

ARCHBALD, Judge (dissenting in part). The petition is well dismissed as to the three respondents, with respect to whom it is found that neither the Elkins nor the interstate commerce act apply. It is held, however, that the Junction Railway Company is a common carrier engaged in interstate commerce, and therefore liable to publish tariffs and to make reports, and as to this I feel compelled to dissent.

Nothing of the kind can be predicated on the use which the Junction Railway Company permits of its tracks by the trunk line carriers as a connecting link, to haul by their own motive power through trains moving from one to the other, east or west. In the loan of its tracks for this purpose, however regular or persisted in, it is not exercising any of the functions of a common carrier, even though it take tolls therefor, any more than a turnpike road, upon which people travel,

or a toll bridge spanning a stream, which accommodates those who go across, or a canal, which, without doing any towing, merely maintains a waterway for public use. Moore, Carriers, p. 66, 67; Kentucky & Indiana Bridge Co. v. Louis. & Nash. R. R. (C. C.) 37 Fed. 573, 615, 2 L. R. A. 289; Grigsby v. Chappell, 5 Rich. (S. C.) 443. The traffic which, by leave of the Junction Railway Company, goes on over its tracks in this way is that of the trunk lines using them, and not of the Junction Railway. The charges for through carriage, including this part of the movement, are made by and paid to these lines, and the Junction Railway does not participate by division or otherwise therein. Neither does it know or come in contact with the shippers or consignees or with the freight which is so moved. It simply lets its road and gets pay for its use at so much a car, which neither makes it a carrier nor constitutes an engagement by it in interstate trade.

Neither is there anything to make it a common carrier in what it does at the Union Freight Station, which it maintains, in the way of receiving, distributing, and forwarding L. C. L. freight. So far as it acts with respect to this for the Baltimore & Ohio Railroad, it acts as the local agent of that company, and is not chargeable in any larger degree. The receiving, loading, and forwarding which it does for others, including the collection of freight charges, when required by the trunk line carriers to be prepaid, and the giving of receipts which are exchangeable for bills of lading therefor, may be of a somewhat more general character. But in no respect do they amount to a transportation of such freight by the Junction Railway on its own account, nor does the Junction Railway Company in any sense act as a common carrier with respect thereto. It merely serves as a receiving and forwarding agent, for which it is compensated by the trunk line carriers by which its services are invoked. Having no concern as such agent in the transportation of this freight, nor any interest in the freight rates charged, and the services being complete when rendered and confined to the mere handling of the freight in the act of receiving and forwarding it, there is nothing in any of this upon which a common carriage can be charged. Moore, Carriers, p. 68. And the same is true, also, with regard to the weighing of freight which it does, even though these weights are at times made the basis of freight charges and adjustments between carrier and consignor or consignee. These activities are alluded to at this time, not only because they are set up in the bill, but because they are necessary to be considered in connection with the other things which it does in determining the character which the Junction Railway Company in fact bears, which, to the extent of these activities, at least, is plainly that of a mere intermediary or local agency of the trunk line companies for which the services are performed. And this character, in all that it does, it consistently maintains.

The so-called hauling and switching services, however, remain; and, for a full understanding of them, they must be given somewhat at large. The practice in this regard with respect to live and dead freight is not exactly the same. Where inbound live stock originates outside of the state, and is destined to points in the stockyards district, the trunk line on which it arrives generally hauls it with its own

motive power over the tracks of the Junction Railway from the connecting point to the unloading docks, chutes, and platforms of the Stockyards Company, although horses are usually delivered by the Junction Railway Company after having been received from the trunk line by which they are brought in. Outbound car load shipments of live stock, however, which originate in the stockyards district and are destined to points outside the state, after being loaded into cars placed by the Junction Railway Company at the loading chutes of the stockyards, are hauled by the Junction Railway over its tracks and delivered at the proper connecting point to the trunk line which is to transport them beyond. Dead freight in car load lots, brought by the trunk line carriers from points outside of the state, destined to points in the district served by the Junction Railway on the line of its tracks, and sometimes also destined to points beyond, is placed by the trunk line roads on what are known as the receiving tracks of the Junction Railway; each car being marked with a card, giving the name of the consignee, by which its destination may be known. And these cars the Junction Railway Company picks up with its own motive power and delivers to the designated consignee or industry, or, where they are destined to points beyond the state, delivers them to the proper connecting outgoing trunk line, according to the destination indicated thereon. Through shipments of this kind move on bills of lading covering the whole distance traversed, including the tracks of the Junction Railway. And the same is true of consignments to and from the Union Stockyards, or the industries of the stockyards district adjacent to the railway company's line. But the Junction Railway Company is not known to the shipper or the consignee in the transaction; all that it does being done for the trunk line carrier which employs it, by which it is paid so much a car. And this payment, also, it receives as a distinct switching charge, regardless of whether the car is loaded or empty, or where it is to go to, or where it comes from. The question, then, is whether by reason of what it so does the Junction Railway Company is a common carrier engaged as such in the transportation of persons or property in interstate trade, within the meaning of the law.

It is claimed that it is, because it participates in the movement of the freight which passes over its tracks in the channels of commerce in the way which has been described, in which movement, it is said, it is an integral and essential factor and not a mere local aid. C., N. O. & T. P. R. R. v. Inter. Com. Com., 162 U. S. 184, 16 Sup. Ct. 700, 40 L. Ed. 935. But to me that does not seem to be the case. The part which it takes in that movement is a purely local and incidental one, in no respect having anything to do with the movement of freight as freight, and much less as interstate freight; its services being confined to the mere handling of the cars in which the freight is contained, this being carried on and completed also wholly within the state, and not, in any respect, extending to anything beyond. It knows no one outside of the trunk line carriers by which it is employed, and does not come in contact or have any relation with the shipper or consignee, except as agent of the trunk line carriers in the receiving and delivering of freight. Nor has it anything to do with

the freight rates charged; the tolls which it gets being taken care of by the trunk lines without appearing in those rates. The service which it performs is a mere shifting or switching service, having no relation to anything outside of that so far as it is concerned. Its undertaking is to shift the cars, and not the freight which they contain, in the movement of which freight it has no interest; and as emphasizing this it is paid by the car without regard to contents, origin, or destination, whether to or from points within or without the state. When the cars are being moved by the Junction Railway Company, the carrier for which in each instance this is being done, in legal contemplation as well as in actual effect, is transporting them; the Junction Railway Company, by its engineers and employés, being merely the medium by which it is accomplished. To engage in transportation within the meaning of the law, there must be a participation in the result; to merely touch it in passing, as here, is not enough. The statute was enacted to regulate interstate commerce, and there must be a direct or proximate connection with interstate shipments to bring the case within its terms; and the mere local shifting or handling of cars in which the commodities move, incidentally, in transit, wholly within the state where it is done, without any share in the freight paid, the service rendered being performed for the carrier by which the through transportation is being done, is not, in my judgment, engaging in interstate commerce in the commodities or in the interstate transportation of them, with which alone the statute undertakes to deal.

It is no doubt true that railroads performing similar switching services to those which we have here have been held to be engaged in interstate commerce, within the meaning of the safety appliance law. United States v. Col. & N. W. R. R., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. (N. S.) 167; United States v. Union Stockyards of Omaha (D. C.) 161 Fed. 919; Belt Line R. R. v. United States, 168 Fed. 542, 93 C. C. A. 666, 22 L. R. A. (N. S.) 582; Union Stockyards of Omaha v. United States, 169 Fed. 404, 94 C. C. A. 626. But there is by no means a unanimity of opinion among the judges by whom these cases were decided; and, as is pointed out by Judge Sanborn, in the leading one (United States v. Col. & N. W. R. R., 157 Fed. 321, 85 C. C. A. 27, 15 L. R. A. [N. S.] 167) the safety appliance act is to be given a broader construction than the interstate commerce act, even though, in the description of the carriers who are made subject to it, the same terms largely are employed in each; the one act dealing with the physical or mechanical instrumentalities of interstate commerce, looking to the safety of employés, while the other is directed to the business or commercial side, regulating the rates and practices which are there to prevail. These decisions, therefore, as it seems to me, are misleading and valueless as precedents, and are not to be applied.

Neither is the case like that of McNamara v. Washington Terminal Company, 39 Wash. Law Rep. 458, recently decided by the District of Columbia Court of Appeals, on which much reliance is placed. The case there arose under the employer's liability act, the validity of which, so far as the District of Columbia is concerned, does not depend, as is pointed out, on the right of Congress to legislate with

regard to interstate or foreign trade, and the question simply was whether the Terminal Company was a common carrier engaged in trade or commerce in the District, within the meaning of the law. Whether the Terminal Company, however, was engaged in interstate commerce, was also held to be involved; and, passing upon that question, it was decided that it was. But the considerations which led to this result are to be observed. The tracks and station of the Terminal Company, it is to be noted, are not mere facilities for the handling of passengers and baggage at Washington. As to the railroads entering the city, the Terminal Company completely monopolizes everything that is done. By its agents and employés it controls the operation of trains over its tracks into and out of the station, and with its engines it shifts empty cars in the making up of trains. Steam railroad passenger traffic, entering and leaving Washington, is thus completely and exclusively managed, operated, and controlled by the Terminal Company within the zone occupied by its station and tracks. The conclusion reached, in view of this, was that it was not to be taken as a ·mere line of railroad, carried on wholly and independently within the District, but that it was a direct component part of the various railroad systems engaged in interstate commerce, through which an entrance into Washington was obtained. And it is this integral and indispensable part which it has in interstate trade coming into and going out of the city that is the criterion by which its position as a medium of interstate commerce is to be judged. It is, in other words, as with the Southern Pacific Terminal (219 U. S. 498, 31 Sup. Ct. 279, 55 L. Ed. 310), its relation to and systematic connection with the interstate railroads, of which it forms the Washington end, and its direct participation in the handling and management of the passenger and express traffic there, that makes it a common carrier engaged in interstate commerce within the meaning of the federal law.

The distinction between that case and the one in hand is clear. The Junction Railway Company was not organized to supply terminal facilities, nor does it in fact supply them for any interstate railroad or business. Nor is it a component part of any such railroad system. Nor does it, in the hauling and switching services which it performs, take the place for the time being, as to consignor or consignee, of the trunk line carrier for which it acts. It simply moves back and forth, by means of its engines and employés, cars which it is put by the trunk line carriers in the way to take, to which carriers in the performance of that service it is alone responsible therefor. It is not an agency of commerce as such, state or interstate, but of the railroads which have that commerce in charge. It is true that it has a railroad, which it operates, over which that commerce incidentally moves. But that does not change the character of the services in which it is engaged. The part which it plays, the relation which it assumes, and the result of what it does, begin and end, so far as it is concerned, with the immediate service which it renders, which negatives the idea that anything like interstate commerce is intended or involved. Not engaging as a common carrier in such transportation, it is not ·brought in consequence within the terms of the act, and cannot be

required either to publish tariffs or to make reports. And the petition ought therefore, in my judgment, to be in all respects denied.

On Petition for Rehearing.

Blackburn Esterline and William E. Lamb, Sp. Asst. Attys. Gen., for the United States.

Ralph M. Shaw, for Union Stockyard & Transit Co. of Chicago and Chicago Junction Ry. Co.

Willard M. McEwen, for Louis Pfaelzer & Sons.

Before KNAPP, Presiding Judge, and ARCHBALD, HUNT, CARLAND, and MACK, Judges.

MACK, Judge. It is urged that this court, in the opinion heretofore filed, has too narrowly limited its jurisdiction in declining to consider whether or not the proposed payment by the Stockyards Co. to the Pfaelzers is a rebate or discrimination forbidden by law.

Counsel contend that inasmuch as the Junction Co., which is alleged and has been found by us to be a common carrier engaged in interstate commerce, is one of the defendants, therefore, under section 2, as well as under section 3, of the Elkins act, other parties not common carriers involved in the subject-matter of the proceedings may likewise be proceeded against in the same action.

But, as we stated in the former opinion, two entirely separate cases have been joined in this proceeding—the one against the Junction Co. and the Stockyards Co. to compel compliance with sections 6 and 20 of the act to regulate commerce; the other against the Stockyards Co., the Investment Co., and the Pfaelzers, under the Elkins act, to enjoin an alleged discrimination and rebate.

While we have not, of our own motion, dismissed the petition for misjoinder of actions and multifariousness, nevertheless we cannot deal with the case otherwise than as involving the two distinct causes of action. The fact that the Junction Co. is a party to the first of these does not make it also a party to the second. No relief of any kind is prayed for against it in respect to the alleged discrimination and rebate. If, as we interpret sections 2 and 3 of the Elkins act, a proceeding thereunder in equity cannot be maintained against parties other than a common carrier engaged in interstate commerce, unless on proper allegations relief is also sought against the commission by such a carrier of one or more of the acts therein prohibited, the fact that the Junction Co., which is such a carrier, is a party defendant on the other branch of the case furnishes no basis for this proceeding against the other defendants.

But counsel further urge that, inasmuch as the Stockyards Co. is, in good faith, alleged to be an interstate common carrier, this court not only has jurisdiction but is in duty bound to determine the legality of the contract with the Pfaelzers.

There is no question as to the jurisdiction of the court in the premises. The petition purports to state a case under the Elkins act. If the defendants had admitted that the Stockyards Co. was an interstate common carrier, the only question to be determined by this court

would have been the legality of the contract. But, when the defendants denied this allegation, they raised an issue of fact the determination of which necessarily preceded any consideration of the issue of law. When that issue of fact was decided in their favor the petition had to be dismissed.

The court nevertheless had the power and the right to base its decision on either or both of two possible grounds, and if we had been clearly of the opinion that such a contract as the one in question, made by an interstate common carrier, were legal, the petition would have been dismissed on both grounds.

The only case stated, or that could properly have been stated, in the petition, was one charging that an interstate carrier had made a contract in violation of the law. Defendants, however, are now asking us to decide a totally different question—whether or not such a contract made by one not a carrier is legal. However important it may be to them to secure an authoritative ruling thereon, any answer that we might give would not be responsive to the issues raised in the case before us, and would, therefore, be a mere dictum, and of no binding force.

No authority has been vested in this court to advise parties, on their application, whether proposed undertakings would, if consummated, violate the law, or, on the application of the government, to enjoin the commission of alleged illegal acts, except only when such an injunction is sought against an interstate common carrier.

An order will therefore be entered in accordance with the original opinion filed herein.